UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

SHARON L. THOMPSON,                    :

                        Plaintiff,     :     **REPORT AND
                                             RECOMMENDATION
                                             TO THE HONORABLE**
            -against-                  :     **GEORGE B. DANIELS**[*]

MICHAEL J. ASTRUE,                     :     07 Civ. 7793 (GBD)(FM)
Commissioner of Social Security,
                                       :

                        Defendant.
---------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

        Pro se plaintiff Sharon L. Thompson ("Thompson") brings this action

pursuant to Section 205(g) of the Social Security Act, as amended ("Act"), 42 U.S.C.

§ 405(g), to seek review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance benefits.  The

Commissioner has moved for an order reversing his prior decision and remanding the

case for further proceedings pursuant to the fourth sentence of Section 205(g).  For the

reasons set forth below, I recommend that the Commissioner's motion, to which

Thompson has not responded, be granted.

---

       [*]    This Report and Recommendation was prepared with the assistance of Sarah
Rosen, a student at the University of Pennsylvania Law School, who is serving as an intern in my
Chambers this summer.

I.     Background

    A.     Procedural History

        Prior to the application for disability insurance benefits giving rise to this action, Thompson filed for disability insurance benefits and supplemental security income on January 27, 2003.  (Compl. (Attach.)).  Thereafter, on January 29, 2004, Administrative Law Judge ("ALJ") Michael Friedman found Thompson entitled to benefits for a closed period of disability which began on December 20, 2002, and ended on December 31, 2003.  (Id.).

        At the hearing before ALJ Friedman, Thompson's counsel stipulated that she "ceased to be disabled due to medical improvement" on the latter date.  (Id.). Notwithstanding this stipulation, on November 4, 2004, Thompson filed a new application for disability insurance benefits, in which she claimed that she became permanently disabled on December 20, 2002.  (R. 12; Compl. (Attach)).[1]  After this application was denied on February 2, 2005, Thompson requested a hearing, which was held before ALJ Jay L. Cohen on July 27, 2006.  (R. 20, 23-24, 27, 301-17).  At the hearing, Thompson appeared pro se and declined to request an adjournment to secure representation.  (Id. at 303).

        On December 15, 2006, the ALJ notified Thompson that he had secured additional evidence from Lincoln Medical Center ("Lincoln") and Bronx Lebanon

---

[1]     "R." refers to the certified copy of the administrative record filed by the Commissioner as part of the Answer.  (Docket No. 6).

Hospital Center ("Bronx Lebanon") and had subpoenaed records from another doctor who apparently did not respond. (Id. at 274-96). The ALJ indicated that he intended to supplement the record with the new hospital records and subpoena and advised her that she could request a supplemental hearing. (Id. at 295). By letter dated December 20, 2006, Thompson informed the ALJ that she would like such a "meeting," and that there was a gap in the Bronx Lebanon records that she thought should be filled. (Id. at 297). Despite this response, the ALJ issued his decision finding Thompson ineligible for benefits on January 24, 2007, without having conducted a supplemental hearing or having received any additional hospital records. (See id. at 12-18).[2] That decision became final on June 13, 2007, when the Appeals Council declined further review. (Id. at 4).

Thompson commenced this action on August 10, 2007, after which it was referred to me for a Report and Recommendation on December 13, 2007. (Docket Nos. 2-3). On April 23, 2008, the Commissioner filed a motion for judgment on the pleadings, requesting that the Commissioner's decision be reversed and remanded. (Docket Nos. 11-12). Despite the passage of more than two months, Thompson has not submitted any opposition papers.

---

[2]    In her letter to the ALJ, Thompson stated that she would "understand" if he "ha[d] to make a decision at this time." (Id. at 297).

3

B.    Relevant Facts

1.    Non-Medical Evidence

Thompson was born on January 6, 1978.  (R. 63).  She testified at the

hearing that she was married and lived with her husband and two children, who were

seven and one and one-half years old.  (Id. at 307).  She completed two years of college

and was enrolled at the time of the hearing at the ASA Institute of Manhattan, a career

training school, where she attended classes five days each week.  (Id. at 71, 307, 314).

Additionally, she had completed an administrative training program in 1997.  (Id. at 71).

Thompson testified that she had worked most recently in 2002 as a security

guard, the only full-time position she ever held.[3]  (Id. at 308, 310).  That job, which

apparently required no formal training, involved patrolling buildings, climbing stairs, and

lifting incoming packages weighing as much as thirty-five pounds.  (Id. at 307-08).

Thompson also volunteered for the police department as an administrative assistant and

had worked part time as a rehabilitation worker for an agency for children with special

needs.  (Id. at 61, 68).  By the time of the hearing, she no longer was employed.  (Id. at

308).

Thompson testified further that she sustained injuries to her right shoulder

and back as the result of a slip and fall in 2002 which prevented her from working.  (Id. at

310).  According to Thompson, she had shoulder surgery in 2004, but still had shoulder

---

[3]        Curiously, although Thompson claimed not to have been employed since 2002, a
printout of her Social Security wages indicates that she earned $9,536 in 2004.  (Id. at 48).

4

and back pain which led her to visit the emergency room for treatment as recently as one month before the hearing. (Id. at 67, 310-13).[4] She could walk two blocks before needing to rest and could sit or stand for about thirty minutes, but could not pick up her children. (Id. at 310-11).

Thompson also testified that she did not shop, cook, clean, or engage in any recreational activities. (Id. at 313-14). She did, however, take public transportation to attend seven classes at the ASA Institute each week, spending up to four hours a day in the classroom on Tuesdays and Thursdays. (Id. at 314-15). She had not been hospitalized, had surgery, or received emergency treatment for her back, but had consulted doctors at Lincoln for pain management. (Id. at 312). She previously had been prescribed Vicodin, but at the time of the hearing was using Ben Gay ointment, taking eight Aleve tablets per day, and undergoing cold laser treatments and steroid injections to alleviate her discomfort. (Id. at 315-16). She also was considering back surgery. (Id. at 316).

In her responses to a New York State Office of Temporary and Disability Assistance questionnaire dated November 23, 2004, Thompson indicated that she felt pain in her lower back and the front top right corner of her right shoulder. (Id. at 93). She further stated that the pain in her back sometimes radiated to her thighs. (Id.).

---

[4]     When she applied for benefits, Thompson also described an "anger problem." (Id. at 67). At the hearing, however, she denied having any continuing mental health problems. (Id. at 313).

Thompson noted that her condition made it difficult for her to sleep, reach high places, dress and bathe herself, care for her hair, shave her legs, and hold her children.  (Id. at 86-87, 89).  She also noted that she had problems lifting, standing, walking, sitting, climbing stairs, and reaching.  (Id. at 90).  She barely could do any housework and could not go out alone with her younger child because she could not carry a stroller.  (Id. at 88).  Nevertheless, Thompson noted that she took her older child to and from school five days a week.  (Id. at 90).  She also stated that she went shopping approximately once each month, with each such trip taking four hours.  (Id. at 89).

            2.      Medical Evidence

        On May 6, 2003, Thompson saw Dr. Sharila Krishnan of the Staten Island Medical Group for shoulder pain related to the recurrent dislocation of her right shoulder.  (Id. at 181, 184).  Thompson reported to Dr. Krishnan that she was not taking any medication for the pain and that she had no numbness or weakness in her arms or legs.  (Id. at 181).  She nevertheless indicated that she wanted to have surgery to repair her shoulder.  (Id.).  A radiology report dated the same day shows that Thompson's mediastinum,[5] lungs, heart and pleural structures[6] were normal.  (Id. at 179).  A

_____

        [5]      The "mediastinum" is a mass of tissues in the chest containing the heart and other organs.  Dorland's Illustrated Medial Dictionary 991 (27th ed. 1988).

        [6]      The "pleura" consists of two membranes surrounding the lungs.  Dorland's, supra note 5, at 1309.

subsequent report of a radiologic study, taken on May 21, 2003, revealed no fracture or

dislocation and no soft tissue calcification of Thompson's shoulder.  (Id. at 174).

Dr. Armin Tehrany, a surgeon, subsequently ordered an MRI of

Thompson's shoulder, conducted on June 4, 2003, which disclosed a deformity of the

humeral head and a bony lesion.  (Id. at 223-24).  Several weeks earlier, Thompson rated

her "overall satisfaction" as "somewhat satisfactory," indicating that her level of pain was

a five on a ten-point scale.  (Id. at 177).  At that time, Thompson also indicated that she

was unable to reach behind her back, reach a high shelf, lift ten pounds above shoulder

level, or participate in "usual sport."  (Id. at 178).

On July 31, 2003, Dr. Tehrany operated on Thompson's shoulder.  (Id. at

149, 152-54).  The procedure consisted of an arthroscopic capsulorraphy,[7] including a

labral repair,[8] an arthroscopic superior labram anterior and posterior lesion repair, and the

insertion of a pain pump.  (Id. at 153).  Dr. Tehrany prescribed Vicodin to ease

Thompson's pain during recovery.  (Id. at 172).  Thompson also received physical therapy

at One on One Sports Rehabilitation between August 19 and November 26, 2003.  (Id. at

124-46, 189, 196-218).  An entry by Dr. Tehrany on September 23, 2003, described

Thompson as "still weak" but "doing great," and requested further physical therapy.  (Id.

---

[7]      "Capsulorraphy" is the suturing of a joint capsule.  Dorland's, supra note 5, at
267.

[8]      "Labral" is a general medical term for an edge, brim, or lip.  Dorland's, supra note
5, at 888.

7

at 192). Thompson's physical therapist's records show that by November 26, 2003,

Thompson was in no pain and that her shoulder strength was below normal, but "good."

(Id. at 146). The therapist discontinued physical therapy and outlined a home exercise

program for Thompson. (Id.).

On August 29, 2003, after Thompson began to complain about knee pain,

Dr. Tehrany examined her and found mild crepitus[9] and mild effusion[10] in her knees. (Id.

at 190). The doctor referred her to a rheumatologist. (Id.). A radiological report dated

December 1, 2003, revealed that Thompson had medial joint space narrowing and mild

lateral patellofemoral[11] joint space narrowing on her left side, with "no other significant

abnormalities." (Id. at 221).

Thompson also underwent a psychiatric evaluation. Dr. Eugene Allen, a

consultative examiner, examined Thompson on December 14, 2004, and diagnosed her

with intermittent explosive disorder and adjustment disorder with explosive features. (Id.

at 233-35). At the time, Thompson was attending therapy sessions for her anger

management issues at Family Services in Harlem. (Id. at 73). She was taking no

medication, but was seeing a therapist weekly. (Id.). She was neatly dressed, spoke

---

[9]    "Crepitus" refers to the grating sensation caused by the rubbing together of the surfaces of the joints. Dorland's, supra note 5, at 395.

[10]    "Effusion" is the escape of fluid into a part or tissue. Dorland's, supra note 5, at 532.

[11]    "Patellofemoral" refers to the region of the patella and the femur bones in the leg around the knee. See Dorland's, supra note 5, at 617, 1241.

coherently, processed information well, and had no particular memory problem. (Id. at

234). She did not hear voices or see images, but was concerned that people were talking

behind her back. Thompson also told Dr. Allen that she could cook for herself and do

household chores. He believed that Thompson would, with psychiatric treatment, be able

to remember, understand, and carry out instructions, interact appropriately with

supervisors and co-workers, and handle the pressures of a job. Dr. Allen found

Thompson's allegations regarding her anger problems to be credible. (Id.).

       Two weeks later, Dr. Mandakini Patel, another consulting physician,

performed an orthopedic evaluation of Thompson. (Id. at 239-44). His diagnosis was

that she suffered from lumbrosacral derangement with limitations in her range of motion.

(Id. at 241). He opined that she would have a moderate impairment in prolonged sitting,

standing, walking, bending, lifting, and heavy household chores. (Id.). Generally,

however, Dr. Patel found no muscle atrophy, spasm, or sensory impairment, and

concluded that Thompson's upper extremities had normal power, control, and

coordination. (Id. at 240). He also found a normal range of motion in Thompson's

shoulder, elbow, wrist, hip, knee and ankle joints, as well as in her fingers and toes. (Id.

at 240-41). Thompson's lumbar spine flexion was forty degrees, her extension was

fifteen degrees, and her lateral flexion was fifteen degrees; she also could raise her legs

fifty degrees. (Id. at 240).

During Dr. Patel's examination, Thompson claimed that she had a "crampy and aching" back pain accompanied by a constant pain that radiated to her thighs.  (Id. at 239).  She stated that she could sit for less than thirty minutes, stand for approximately fifteen minutes, and walk two to three blocks.  She also stated that she could bathe and dress herself, but that her husband did most of the shopping and cleaning in their household.  (Id.).  An X-ray of Thompson's lumbosacral spine on December 30, 2005, showed that she had a transitional L5 vertebral body, but was otherwise "unremarkable." (Id. at 242).

A psychiatric review completed by Dr. M. Apacible on January 24, 2005, indicated that Thompson's affective and personality disorders, which he characterized as an adjustment disorder with depressed mood, were not severe.  (Id. at 245-46).  The doctor found that Thompson had no functional limitations with regard to her daily activities due to psychiatric problems and that there was insufficient evidence of repeated episodes of deterioration.  He also noted, however, that Thompson had mild difficulties in maintaining social functioning, concentration, persistence, or pace.  (Id. at 247).  He opined that Thompson did not satisfy the "C" criteria of the "Listings."  (Id. at 248).

On February 26, 2006, Thompson visited the emergency room at Bronx Lebanon after experiencing pain in her left shoulder.  (Id. at 285-88).  Thompson's left shoulder was tender and had a limited range of motion, but an X-ray showed no dislocation or fracture.  (Id. at 288).  She was diagnosed as having had a shoulder

dislocation that relocated itself, was given Toradol,[12] and was counseled regarding the need for a follow-up visit before being discharged.  (Id.).

Thompson returned to the Bronx Lebanon emergency room on April 13, 2006, complaining of pain in her right shoulder that began ten days earlier.  (Id. at 289-92).  An X-ray showed that Thompson's shoulder was normal; the clinical impression was that she had sprained her shoulder.  (Id. at 292).

On June 16, 2006, Thompson sought treatment for pain at Lincoln.  (Id. at 265).  She described her pain level as a "6" but the records do not specify a particular ailment.  (Id. at 266).  Thompson apparently left the facility before being examined.  (Id. at 267).[13]

On June 26, 2006, Thompson saw Dr. Kim Painter at Health Plus, who approved her for three pain management visits after she complained of pain in her lower back and claimed that physical therapy had provided only minimal relief.[14]  (Id. at 261).  Thompson also may have received a trigger point injection, which provided only brief relief for her lower back pain, on or about this date.  (Id. at 269).

---

[12]    Toradol is a nonsteriodal anti-inflammatory drug indicated for the short-term management of moderately severe acute pain.  See Physician's Desk Reference 2789 (55th ed. 2001).

[13]    A nurse's progress note from this date indicates that the "MD states that she sent patient home already."  (Id.).

[14]    The record provides evidence of physical therapy for Thompson's shoulder, but not her back.

On July 25, 2006, Thompson was examined by nurse practitioner Nora Cuison-Salvatoriello at Lincoln, who performed a cold laser treatment. (Id.). Thompson also was referred to Dr. Allison Jennison in neurosurgery for a more extensive evaluation of her back pain. (Id.). During the evaluation, Thompson described her pain level as a "three." (Id. at 271). The doctor also noted that Thompson was receptive and verbalized adequate understanding of the proceedings. (Id. at 270). By this point, Thompson had undergone several physical therapy sessions for her back and taken Aleve for the pain. She stated that the trigger point injections and laser treatments had been unsuccessful. (Id. at 277). Dr. Jennison ordered an MRI of Thompson's lumbosacral spine, which was taken on July 26, 2006. (Id. at 273, 277, 279). The MRI results showed a normal spine with no herniated disks. (Id. at 279).

Thompson had a follow up visit with Dr. Jennison on August 15, 2006. (Id. at 276). At the time of the visit, she described her back pain as severe, noting that it had not improved since she last saw the doctor. (Id.). Dr. Jennison decided that neurosurgical intervention would be unnecessary and prescribed a physical therapy program instead. (Id. at 276, 279).

During the hearing, Thompson observed that records regarding her previous physical therapy with Dr. Regina Gurevich were missing from her file. (Id. at 304-05). Accordingly, on September 21, 2006, ALJ Cohen subpoenaed these records from Dr. Gurevich. (Id. at 293-94). There is no indication, however, that Dr. Gurevich complied

12

with the subpoena or that the ALJ ever contacted the doctor after the subpoena was served.

         3.    <u>Other Evidence</u>

       After the hearing, ALJ Cohen received additional medical records from Lincoln and Bronx Lebanon.  (<u>Id.</u> at 274-95).  On December 15, 2006, ALJ Cohen sent Thompson a letter advising her of the additional evidence, which he proposed to enter into the record.  (<u>Id.</u> at 295-96).  The ALJ's letter also noted that Thompson could respond to the new evidence by submitting written comments, a written statement, or additional evidence, and that she also had the right to submit written questions to the authors of the new reports.  (<u>Id.</u> at 295).  The ALJ further indicated that Thompson had the right to request a supplemental hearing so that she could testify and provide additional evidence or witnesses.  (<u>Id.</u>).

       Thompson responded with a letter to the ALJ on December 20, 2006, in which she requested a further "meeting" with ALJ Cohen.  (<u>Id.</u> at 297).  Thompson enclosed several discharge forms from the Bronx Lebanon emergency room, dated August 19, September 11, and October 20, 2006.  (<u>Id.</u> at 298-300).  She also noted the existence of additional records from the hospital that she wished to make a part of the record.  (<u>Id.</u> at 297).

       On January 6, 2007, C. Zelno, a disability analyst in the New York State Office of Temporary and Disability Assistance's Division of Disability Determinations

prepared a Physical Residual Functional Capacity Assessment of Thompson. (Id. at 250-

55). Zelno found that Thompson could occasionally carry a maximum of twenty pounds,

could frequently carry a maximum of ten pounds, and could sit or stand for about six

hours in an eight-hour work day. (Id. at 251). Zelno also found that Thompson's ability

to push and/or pull with her right arm was limited. (Id. at 252). He opined that her

allegations regarding the severity of her back pain and limited ability to sit or stand were

not credible. (Id. at 254).

       C.     <u>ALJ Decision</u>

       Following the hearing and his review of the administrative case record,

including the materials that he had subpoenaed after the hearing, ALJ Cohen concluded

that Thompson was not disabled within the meaning of the Act and denied her application

for disability benefits. (Id. at 9-18). He first found, based on the record of Thompson's

2004 earnings, that she had engaged in substantial gainful employment since the alleged

onset of her disability on December 20, 2002. (Id. at 14, 48). The ALJ then determined

that Thompson had "severe impairments" in her lower back and knees because she was

"status post arthroscopic surgery," but that none of these impairments, either singly or in

combination, satisfied the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1.

(Id. at 14).

       Next, the ALJ found that Thompson was able to perform sedentary work,

which would not require her to lift and carry objects over ten pounds, and would limit her

walking and standing to two hours each workday.  (Id. at 15).  The ALJ further stated that

the medical record contained no evidence that Thompson's injuries would completely

preclude her from working, and that her own allegations to the contrary were not "entirely

credible."  (Id. at 16).  Finally, the ALJ found that Thompson was unable to perform her

past employment as a security guard because of her limited residual functional capacity,

but that there were a "significant" number of jobs in the national economy that someone

of her age, education, and work experience could perform.  (Id. at 17).

  Although the ALJ relied on the exhibits received after the conclusion of the

hearing multiple times in his decision, his decision did not mention Thompson's letter

requesting an additional "meeting."  (Id. at 14-18).

II. <u>Discussion</u>

  A. <u>Failure to Hold a Full and Fair Hearing</u>

  The Act empowers this Court to conduct a limited review of the

Commissioner's determination regarding a claimant's benefits to determine whether it is

supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3).  Before deciding if

the Commissioner's determination is supported by substantial evidence, however, the

Court must first conclude that the applicant received a "full hearing under the Secretary's

regulations and in accordance with the beneficent purposes of the Act."  <u>Echevarria v.</u>

<u>Sec'y of Health & Human Servs.</u>, 685 F.2d 751, 755 (2d Cir. 1982) (quoting <u>Gold v.</u>

<u>Sec'y of Health, Educ., & Welfare</u>, 463 F.2d 83, 43 (2d Cir. 1972)) (internal quotation

marks omitted).  If the Court finds that an applicant was denied such a full and fair hearing, it must remand the case to the Commissioner even if the Commissioner's decision was supported by substantial evidence.  See Morgan v. United States, 304 U.S. 1, 15 (1938) (describing fair hearings as "essential" to the validity of the process); Echevarria, 685 F.2d at 755 (whether a claimant received a full and fair hearing is a threshold determination that must be made before reaching the issue of substantial evidence); Hankerson v. Harris, 636 F.2d 893, 896 (2d Cir. 1980) (remanding case due to lack of a full hearing).

A claimant has not received a full and fair hearing when the ALJ fails to provide the claimant with an opportunity to respond to adverse evidence on which the ALJ relies in making a determination of disability.  See Townley v. Heckler, 748 F.2d 109, 114 (2d Cir. 1984) (remanding case because claimant was denied the opportunity to present rebuttal evidence and therefore a full hearing); Gullo v. Califano, 609 F.2d 649, 650 (2d Cir. 1979) (finding that claimant was denied a full hearing because claimant was not given the opportunity to challenge a medical report); Duran v. Barnhart, No. 01 Civ. 8307 (GWG), 2003 WL 103003, at *7-8 (S.D.N.Y. Jan. 13, 2003) (holding that claimant did not receive a full hearing when ALJ improperly relied on post-hearing evidence before allowing an opportunity for rebuttal); Jasmin v. Callahan, No. 97 Civ. 2429 (SS), 1998 WL 74290, at *5 (S.D.N.Y. Feb. 20, 1998) (remanding for further proceedings because claimant did not have a chance to confront post-hearing evidence).  Moreover,

16

when a claimant appears <u>pro se</u>, as here, the ALJ has a heightened duty to ensure that her rights are adequately protected. <u>Cullinane v. Sec'y of Heath & Human Servs.</u>, 728 F.2d 137 (2d Cir. 1984); <u>Echevarria</u>, 685 F.2d at 755; <u>Gold</u>, 463 F.2d at 43; <u>Smith v. Bowen</u>, 687 F. Supp. 902, 905 (S.D.N.Y. 1988).

       In this case, it is undisputed that the ALJ failed to provide Thompson with an opportunity to respond to the exhibits that were added to the record after the conclusion of the hearing. (Def.'s Mem. at 8). Additionally, although the ALJ had an obligation to assist Thompson as a <u>pro se</u> claimant, he ignored her request for a further hearing and proceeded to issue a finding of nondisability without holding a hearing or securing the additional materials that Thompson said were missing from the file. (Docket Nos. 11-12; R. 14-18). Because the ALJ did not provide Thompson with an opportunity to rebut the evidence that he had acquired after the hearing, and relied on that evidence in making the determination that she was not disabled, Thompson did not receive the full and fair hearing required by the Act. As the Commissioner concedes, the ALJ's decision therefore cannot be upheld. (Def.'s Mem. at 1, 8-9).

B.    <u>Remand for Calculation of Benefits is Not Proper</u>

       Finally, the Commissioner suggests that a reversal of the ALJ's decision and remand solely for the calculation of benefits would not be proper because the administrative record fails to establish that Thompson is disabled. (Def.'s Mem. at 9-12). Such a remand solely for the calculation of benefits is in fact an "extraordinary action,

which is proper only when further development of the record would serve no purpose."

Rivera v. Barnhart, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005) (citing Rosa v. Callahan,

168 F.3d 72, 83 (2d Cir. 1999)).

   Here, there is evidence which would support an eventual finding of

nondisability.  For example, Thompson's physical therapist noted that, as of November

26, 2003, Thompson had "good" strength in her right shoulder and did not feel any pain.

(R. 146).  Dr. Patel's consultative examination report, dated December 28, 2004, also

indicates that Thompson had only a moderate impairment in "prolonged sitting, standing,

walking, bending, lifting, and heavy household chores."  (Id. at 241).  X-rays taken on

April 13, 2006, further showed that Thompson's shoulder was "normal."  (Id. at 291).

Similarly, an MRI taken on July 26, 2006, showed that Thompson had a normal spine

with no herniated disks.  (Id. at 279).  Finally, Thompson testified that she no longer

suffers from mental health problems.  (Id. at 313).  Given this evidence, Thompson is not

entitled to a remand solely for calculation of benefits.

III. Conclusion

   For the foregoing reasons, the Commissioner's motion for judgment on the

pleadings should be granted, and this case should be remanded for further administrative

proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

IV.    Notice of Procedure for Filing of Objections to this Report and Recommendation

               The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable George B. Daniels, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Daniels.  The failure to file timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

Dated:      New York, New York
             July 2, 2008

                                              FRANK MAAS
                               United States Magistrate Judge

19

Copies to:

Sharon L. Thompson
434 Miller Street, #2
Brooklyn, New York 11207

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York  10007